*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* O. JACKSON, Minor.

UNPUBLISHED
October 04, 2024
8:41 AM

No. 370272
Midland Circuit Court
Family Division
LC No. 21-005327-NA

Before: BORRELLO, P.J., and MURRAY and LETICA, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating her parental rights to her minor child, OJ, pursuant to MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (c)(*ii*) (failure to rectify other conditions), (g) (failure to provide proper care and custody), and (j) (reasonable likelihood of harm if returned to parent).[1] On appeal, respondent argues that the trial court erred by finding that statutory grounds existed to support termination and that termination of her parental rights was not in OJ's best interests. We affirm.

## I. FACTUAL BACKGROUND

In December 2021, the Department of Health and Human Services (DHHS) filed a petition to remove OJ from respondent's care, and, later filed an amended petition. DHHS alleged that it had received reports that 21-month-old OJ was hospitalized for severe facial trauma and treated for suspected physical abuse. OJ was also unresponsive, severely dehydrated, and malnourished. He had a severe diaper rash that indicated no one had changed his diaper for several days and he tested positive for cocaine. In fact, when OJ was born in March of 2020, he tested positive for cocaine and respondent admitted using cocaine throughout her pregnancy.

Weeks before OJ's hospitalization, the local Sheriff's Department had responded to OJ's parents' home to treat father for a drug overdose. Despite this, respondent left OJ in father's care

---

[1] The child's father voluntarily relinquished his parental rights and he is not a party to this appeal.

for three days while looking for a job in Saginaw. Respondent further admitted to using crack cocaine while she was away, and, when OJ was found, his father appeared to be intoxicated.

During a search of OJ's home, law enforcement found deplorable conditions. More specifically, the home was filled with dog feces, mouse droppings, dirty clothing, and items indicative of illicit drug use. Furthermore, OJ's pack-and-play was soaked in urine.

After OJ was removed, respondent admitted to DHHS's allegations regarding father's prior substance abuse, the condition of the home, and OJ's injuries. The trial court found that one or more of the grounds alleged in DHHS's petition were established and exercised jurisdiction over OJ. The court ordered respondent to participate in and benefit from substance-abuse treatment, random drug screens, parenting classes, and homemaker services. The court also ordered respondent to complete a psychological evaluation and follow recommendations, sign all necessary releases for her services, obtain appropriate housing and a legal source of income, and remain in contact with DHHS.

Respondent maintained sobriety and employment for over a year, but her compliance with her remaining services was inconsistent at best. And although respondent initially engaged in parenting time with OJ, her parenting time was suspended because she was frequently late and only partially engaged with OJ during visits, resulting in negative emotional responses and behaviors.

In October 2023, DHHS petitioned the court to terminate respondent's parental rights. At the termination hearing, respondent's caseworker, therapist, and homemaker services provider testified that respondent had not made progress or benefited from services. They further testified that the barriers to reunification that existed at the outset of the case continued to exist at the time of the termination hearing. Respondent also committed retail fraud and was on probation from which she was unsuccessfully discharged. Respondent tested positive for marijuana, kratom, and alcohol. She failed to submit to drug tests and forged her signature on recovery meeting sheets. Moreover, respondent was involved in relationship with a new partner who died from a drug overdose and was dishonest with DHHS about it. The court found that DHHS established by clear and convincing evidence that termination of respondent's parental rights was appropriate under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j), and that termination was in the child's best interest. This appeal followed.

## II. STANDARDS OF REVIEW

We review for clear error a trial court's finding that a statutory ground for termination of parental rights has been proven by clear and convincing evidence. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). A finding is clearly erroneous if "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Id*. at 41 (quotation marks and citation omitted). We give deference to "the special ability of the trial court to judge the credibility of witnesses." *In re Medina*, 317 Mich App 219, 227; 894 NW2d 653 (2016) (quotation marks and citation omitted).

## III. STATUTORY GROUNDS FOR TERMINATION

Respondent argues that the trial court clearly erred by finding the statutory grounds supporting termination of her parental rights by clear and convincing evidence. We disagree.

"To terminate parental rights, the trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been proved by clear and convincing evidence." *In re Pederson*, 331 Mich App 445, 472; 951 NW2d 704 (2020) (quotation marks and citation omitted). A court may terminate parental rights pursuant to MCL 712A.19b(3)(c)(*i*) if it finds clear and convincing evidence of the following:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds . . . the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

Termination pursuant to subdivision (c)(*i*) is appropriate when "the totality of the evidence" supports a finding that the parent "had not accomplished any meaningful change in the conditions" that led to the court taking jurisdiction over the minor child. *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009). In this case, the record supports the trial court's findings that the 182-day requirement was satisfied, the conditions that led to the adjudication continued to exist, and there was no reasonable likelihood that the conditions would be rectified within a reasonable time considering OJ's age.

The conditions that led to adjudication were primarily respondent's substance use, parenting skills, and ability to maintain a clean and safe home. Respondent's lack of employment and financial stability were also concerns. DHHS offered respondent numerous services to help her reunite with OJ; however, she failed to consistently participate or fully benefit from them.

After respondent completed a psychological evaluation, it indicated that she lacked insight into how her substance abuse affected her parenting. And although respondent attended most of her individual therapy appointments, her therapist testified that respondent only made "surface-level" progress and could not provide OJ with safety and protection.

Respondent participated in inpatient and outpatient substance-abuse treatment. She tested positive for prohibited substances, including cocaine and methamphetamine as well as alcohol. After respondent relapsed, she entered inpatient treatment for the second time. Respondent also missed drug screens. Further, it was discovered that respondent forged signatures on her recovery group sign-in sheets, causing DHHS to question respondent's actual attendance. Indeed, respondent's dishonesty with DHHS personnel and service providers continued throughout the proceedings. For example, in August 2023, respondent began a relationship with a man, who later died of an overdose. Respondent lied to DHHS about the man's identity and her relationship with him. As a result, respondent's caseworker believed that respondent had not truly benefited from substance-abuse treatment and was at a high risk for relapse.

Respondent also participated in one parenting program, but she failed to complete the necessary tests in order to fully comply with the services, even after DHHS reminded her several times. Two other parenting programs stopped offering respondent services because she frequently missed meetings or arrived late. Respondent did not have an opportunity to demonstrate her parenting skills after the trial court suspended her parenting time, but respondent's therapist testified that respondent did not appear to have developed new parenting skills that DHHS was unaware of.

Respondent was employed part-time at a restaurant. She then obtained another job for about a month before taking her latest job as a care provider for a family member. Despite being employed, respondent lacked propane to heat her home and water, and she misrepresented the source of the problem. During the termination hearing, respondent finally presented evidence that she had propane after caseworkers filed for emergency relief on respondent's behalf. Moreover, at times, respondent had minimal food in her home and DHHS was concerned about her lack of food for her pets. In fact, a large food assistance card dissipated in a short timeframe and respondent allowed others to use it. Respondent also did not work with DHHS to create a budget and obtain financial independence; instead, she remained financially dependent on her parents throughout the case. Likewise, respondent did not participate in or benefit from homemaker services. DHHS stopped providing respondent with homemaker services because she failed to make regular appointments with her service provider and she did not demonstrate consistent improvement in her ability to keep her home clean.

Accordingly, the trial court did not clearly err by concluding that the conditions that led to jurisdiction continue to exist and that there was no reasonable likelihood that respondent would rectify them within a reasonable time. See MCL 712A.19b(3)(c)(*i*). Because only one statutory ground need be established by clear and convincing evidence to terminate a respondent's parental rights, we need not address respondent's arguments regarding the remaining statutory grounds. See *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011).

## IV. BEST-INTERESTS DETERMINATION

Respondent also argues that the trial court clearly erred by finding that termination of her parental rights was in OJ's best interests. We disagree.

"If the court determines that one or more statutory grounds for termination exist and that termination is in the child's best interests, the court must enter an order terminating the respondent's parental rights and order that additional efforts for reunification not be made." *In re Ferranti*, 504 Mich 1, 16; 934 NW2d 610 (2019), citing MCL 712A.19b(5). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). "[T]he focus at the best-interest stage has always been on the child, not the parent." *Id*. at 87. In making a best-interests determination, the court may consider factors such as "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home . . . ." *Olive/Metts*, 297 Mich App at 41-42 (citations omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child,

the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014).

Respondent argues that termination was inappropriate in her case because she had a bond with OJ and because OJ loved her. While the record supports that respondent had a bond with OJ, the record also reflects that interaction with respondent was not beneficial to OJ's emotional well-being. Before parenting time was suspended, respondent often paid more attention to her oldest child and struggled to check if OJ's diaper had to be changed. After visits, OJ began to exhibit signs of emotional distress. OJ became more physically aggressive toward other children, he had difficulty sleeping, he had night terrors, he would wake up screaming, and he struggled with emotional regulation around visits with respondent. OJ also began negatively responding to the worker associated with respondent's parenting time. In addition to these behaviors, respondent's caseworker testified that he believed respondent's bond with OJ was weakened before the trial court suspended parenting time as a result of respondent's lack of effort to bond with OJ. To the extent that respondent had a bond with OJ at the time of termination, the record indicates that the bond was not necessarily emotionally healthy for OJ. See *In re CR*, 250 Mich App 185, 196-197; 646 NW2d 506 (2002), overruled on other grounds by *In re Sanders*, 495 Mich 394 (2014) (holding that the fact that there was a "serious dispute on the record concerning whether [the respondent] had a healthy bond of any sort with her children" supported the conclusion that termination of her parental rights was in the children's best interests).

The parent-child bond between respondent and OJ was only one factor considered by the trial court. See *Olive/Metts*, 297 Mich App at 41. The trial court considered OJ's young age and the length of time he had been in foster care. The court also considered that OJ's chances of being adopted were very good. Further, the court considered respondent's failure to comply with and benefit from her service plan. The court found that OJ needed permanency and stability during an important developmental stage in his life, which respondent could not offer him. The record reflects that OJ's foster family supported OJ, provided him with healthy relationships, and allowed OJ to thrive. Accordingly, we conclude that the trial court did not clearly err by finding that termination of respondent's parental rights was in OJ's best interests.

Affirmed.

/s/ Stephen L. Borrello
/s/ Christopher M. Murray
/s/ Anica Letica